MIDWEST TRUST SERVICES, INC., as Special Adm'r of the Estate of James Howard, Deceased, Plaintiff-Appellant, v. CATHOLIC HEALTH PARTNERS SERVICES, formerly known as Columbus-Cabrini Medical Center, Defendant-Appellee.

First District (1st Division)   No. 1—06—2257

Opinion filed June 8, 2009.

Andrew A. Galich, of Bernard R. Nevoral and Associates, Ltd., of Chicago, for appellant.

Hugh C. Griffin, Gerald W. Huston, and Jacob Z. Goldstein, all of Hall, Prangle & Schoonveld, LLC, of Chicago, for appellee.

JUSTICE HALL delivered the opinion of the court:

Plaintiff, Midwest Trust Services, Inc., as special administrator of the estate of James Howard, deceased, appeals from a circuit court order granting summary judgment in favor of defendant, Catholic Health Partners Services, formerly known as Columbus-Cabrini Medical Center. We have jurisdiction under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). For the reasons that follow, we affirm.

This action arose out of the death of James Howard, who died of a heart attack at the hospital on May 10, 1995, approximately 48 hours after undergoing cervical fusion surgery. In August 1996, plaintiff filed an underlying medical malpractice action (No. 96 L 9001) against Catholic Health Partners Services (Catholic Health Partners), Chicago Lake Shore Medical Associates, Ltd. (Lake Shore Medical), and two physicians, Dr. Peter G. Curran and Dr. Jan Leetsma.

On May 4, 2000, plaintiff filed the present action (No. 00 L 5121) for spoliation of evidence against Catholic Health Partners, Lake Shore Medical, and Drs. Curran and Leetsma. In regard to Catholic Health Partners, plaintiff alleged that the health care provider, through its agents, either intentionally, carelessly, or negligently: failed to prepare or preserve an "occurrence report" typically created following a death at the hospital occurring within 48 hours of surgery; failed to preserve electrocardiogram (EKG) strips generated on May 4, 1995, the date the decedent was admitted to the hospital for surgery; failed to preserve cardiac monitoring strips generated during the decedent's stay in intensive care; and subsequent to the decedent's death, prepared and attached a physician's exam purportedly completed prior

to the death. Plaintiff alleged that the failure to prepare or preserve this evidence impaired its ability to prosecute the underlying medical malpractice action.

Lake Shore Medical sought to sever the claims made against it in the spoliation case and then have those claims consolidated with the underlying medical malpractice case. Circuit Court Judge Judith Cohen denied Lake Shore Medical's motion, and the 1996 medical malpractice case proceeded to trial before Judge Michael Kelly.

Lake Shore Medical then brought a pretrial motion in the medical malpractice case seeking to bar plaintiff's nursing experts from referencing any allegations of spoliation of evidence. The motion was initially denied, but upon reconsideration Judge James Varga granted the motion. Plaintiff thereafter withdrew its nursing expert.

In pretrial proceedings before Judge Kelly in the medical malpractice case, plaintiff voiced no objection to the granting of a motion *in limine* barring testimony regarding negligence or criticism of nursing or hospital care. Judge Kelly also granted a motion *in limine* barring any references to lost or missing hospital records, to which plaintiff did not object.

The medical malpractice case proceeded to a jury trial. As a result of pretrial motions and motions *in limine*, the plaintiff's theory against Catholic Health Partners was limited to the negligence of its agent, Dr. Steven Bekas, a resident physician employed by the hospital. Plaintiff alleged that Dr. Bekas deviated from the standard of care during the decedent's stay in the intensive care unit by failing to adequately communicate the decedent's postoperative condition to incoming physician Dr. James Hall.

On June 14, 2000, the jury returned a verdict in favor of Catholic Health Partners and Dr. Bekas. Plaintiff did not appeal from this adverse ruling. The jury, however, could not reach a verdict as to the remaining defendants, resulting in the trial court declaring a mistrial. The medical malpractice action remains pending as to these defendants.

On July 2, 2001, plaintiff filed a fourth amended complaint in its spoliation case. Plaintiff alleged that Catholic Health Partners through its agents was guilty of one or more of the following intentional, careless, or negligent acts or omissions: prepared and failed to preserve occurrence reports; failed to preserve electrocardiogram (EKG) strips generated on May 4, 1995, as well as cardiac monitoring strips generated during the decedent's stay in intensive care; and subsequent to the decedent's death, prepared and inserted into the decedent's medical chart a physician's exam purportedly completed prior to his death in an attempt to give the impression that all tests for preoperative clearance had been verified.

Plaintiff alleged that as a proximate result of one or more of these acts or omissions it was injured in that, but for the loss, destruction, or alteration of this evidence, it would have prevailed in the underlying medical malpractice action. Plaintiff alleged that the ECG strips "would have further corroborated plaintiff's expert cardiologist's testimony that the films taken during that test were abnormal and not artifactual."

Plaintiff further alleged that the cardiac monitoring strips would have shown that the decedent experienced three postoperative PVCs[1], requiring him to remain in intensive care rather than being transferred to a general floor; that the occurrence report would have contained an admission against interest; and that the medical chart would have shown that Dr. Curran was negligent in clearing the decedent for surgery.

On October 25, 2001, plaintiff refiled its medical malpractice case (No. 01 L 13394) against Lake Shore Medical and other defendants. On June 10, 2002, the trial court consolidated the 2000 spoliation case (No. 00 L 5121) with the 2001 medical malpractice case (No. 01 L 13394) for discovery purposes.

On July 8, 2005, Catholic Health Partners filed a motion for summary judgment on plaintiff's spoliation claims. The matter was continued several times on plaintiff's motion seeking to file a fifth amended complaint. The plaintiff's motion was denied on January 23, 2006, and a briefing schedule for summary judgment was entered.

By April 28, 2006, plaintiff dismissed with prejudice all defendants in the spoliation case except Catholic Health Partners. After several briefing issues were resolved, the trial court heard oral argument on Catholic Health Partners' motion for summary judgment on June 5, 2006. On July 20, 2006, the trial court issued a memorandum and order granting summary judgment in favor of Catholic Health Partners. Plaintiff now appeals from that order.

The primary issue in the spoliation case was whether the loss, destruction, or alteration of the cardiac monitoring strips prevented plaintiff from proving its case against Dr. Bekas in the underlying medical malpractice action. Plaintiff presented the following facts in

---

[1] A PVC or premature ventricular contraction has been variously defined as a " 'contraction of the ventricles (lower chambers of the heart) occurring sooner than it should in the timetable of the heart action' " (*Cotter v. Harris*, 642 F.2d 700, 702 n.3 (3d Cir. 1981), quoting J. Schmidt, Attorneys' Dictionary of Medicine 207 (1980)); an ineffectual heartbeat which diminishes the blood supply to the heart (*Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528, 536 (6th Cir. 1993)); or a potentially dangerous irregular heartbeat (*Stewart v. Maryland*, 65 Md. App. 372, 385, 500 A.2d 676, 682 (1985)).

its pleadings, answers to interrogatories, and medical charts and documents concerning its spoliation claims.

The decedent underwent surgery on May 9, 1995. Following surgery, he was transferred to postoperative intensive care on the afternoon of May 9, 1995, where he eventually came under the care of Dr. Bekas, who was working a 12-hour shift beginning at 7 p.m.

On May 10, 1995, at approximately 6:30 a.m., Dr. Bekas charted that the decedent was experiencing a "fair number of PVCs." The doctor, however, did not identify the exact number of PVCs the decedent actually experienced and he did not incorporate cardiac monitoring strips documenting the decedent's PVCs into his medical chart.

On May 10, 1995, at approximately 8:10 a.m., Dr. Hall charted that the decedent was experiencing "occasional PVCs." Similar to Dr. Bekas, Dr. Hall did not identify the exact number of PVCs the decedent actually experienced and he did not incorporate cardiac monitoring strips documenting the decedent's PVCs into the medical chart.

Plaintiff claimed that it was important to document the number of PVCs the decedent was experiencing because the hospital had a policy that if a patient experienced three or more PVCs in a row, then that patient was required to remain in intensive care. Plaintiff alleged that if the evidence of the cardiac monitoring strips had been presented in the underlying medical malpractice case, it would have shown that the decedent should not have been transferred out of ICU but rather should have remained in intensive care, where he could have undergone a complete cardiology workup and monitoring.

Plaintiff claimed that in every shift prior to the shift at issue, a representative cardiac monitoring strip was generated and placed in the decedent's medical chart. Plaintiff also pointed out that according to hospital bylaws, all medical records, including cardiac monitoring strips, are retained for 10 years. Plaintiff maintained that hospital bylaws and practice created an inference that the missing cardiac monitoring strips had in fact been created even though there was disagreement on this issue.

Plaintiff also noted that a cardiac monitoring strip had been generated on May 10, 1995, at 8:29 a.m., which showed that the decedent experienced two PVCs in a row (couplet). This strip was torn on the right side immediately following the couplet. Plaintiff claimed that the tear created an inference that the strip was intentionally altered from its original length to cover up the fact that the decedent actually experienced three PVCs in a row.

## ANALYSIS

In this case, the trial court held that summary judgment was appropriate due to lack of proximate cause. The court noted that

although proximate cause was generally a question of fact for the trier of fact to resolve, it may be determined as a matter of law where the facts indicate that the plaintiff would not be entitled to recover. See, *e.g.*, *Phillips v. Budget Rent-A-Car Systems, Inc.*, 372 Ill. App. 3d 155, 165, 864 N.E.2d 709 (2007).

In granting summary judgment in favor of Catholic Health Partners, the trial court determined that the loss of the cardiac monitoring strips did not cause plaintiff to be unable to prove its case against Dr. Bekas in the underlying medical malpractice action, because even without the strips, the plaintiff's expert witness, Dr. Jay Schapira, a cardiologist, possessed sufficient information to render his standard of care opinions against Dr. Bekas. The trial court concluded that, therefore, no question of fact existed as to whether the loss of the cardiac monitoring strips caused plaintiff to be unable to prove the underlying medical malpractice case.

We review the grant of summary judgment under a *de novo* standard of review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits, when viewed in the light most favorable to the nonmovant, reveal there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Gawryk v. Firemen's Annuity & Benefit Fund*, 356 Ill. App. 3d 38, 41, 824 N.E.2d 1102 (2005).

Plaintiff contends that the trial court erred in granting summary judgment in favor of Catholic Health Partners because genuine issues of material fact exist as to whether the failure of Dr. Bekas to incorporate the cardiac monitoring strips documenting the decedent's PVCs into his medical chart prevented plaintiff from prevailing in the underlying medical malpractice action. Plaintiff also contends that genuine issues of material fact exist as to whether the alteration of the 8:29 a.m. cardiac monitoring strip prevented it from prevailing in the underlying medical malpractice action.

The primary question in this appeal is whether genuine issues of material fact exist on the issue of spoliation of evidence so as to preclude the grant of summary judgment. For the reasons that follow, we find that such issues do not exist and therefore we affirm.

The destruction, mutilation, alteration, or concealment of evidence is commonly referred to as spoliation. Black's Law Dictionary 1409 (7th ed. 1999). Such conduct can support an inference that the evidence would have been unfavorable to the party responsible for its destruction or nonproduction. *Haynes v. Coca Cola Bottling Co. of Chicago*, 39 Ill. App. 3d 39, 46, 350 N.E.2d 20 (1976); *R.J. Manage-*

*ment Co. v. SRLB Development Corp.*, 346 Ill. App. 3d 957, 965, 806 N.E.2d 1074 (2004).

Spoliation of evidence is not an independent cause of action but can be stated under existing negligence law requiring a plaintiff to plead the existence of a duty, a breach of that duty, an injury proximately caused by the breach, and damages. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 193-95, 652 N.E.2d 267 (1995); *Thornton v. Shah*, 333 Ill. App. 3d 1011, 1020, 777 N.E.2d 396 (2002). Here, the trial court determined that the plaintiff failed to satisfy the proximate causation element.

To satisfy the element of proximate causation in an action for negligent spoliation of evidence a plaintiff must allege "sufficient facts to support a claim that the loss or destruction of the evidence *caused the plaintiff to be unable to prove* an underlying lawsuit." (Emphasis in original.) *Boyd*, 166 Ill. 2d at 196. As our supreme court explained:

"A plaintiff need not show that, but for the loss or destruction of the evidence, the plaintiff would have prevailed in the underlying action. This is too difficult a burden, as it may be impossible to know what the missing evidence would have shown.

A plaintiff must demonstrate, however, that but for the defendant's loss or destruction of the evidence, the plaintiff had a reasonable probability of succeeding in the underlying suit. In other words, if the plaintiff could not prevail in the underlying action even with the lost or destroyed evidence, then the defendant's conduct is not the cause of the loss of the lawsuit." *Boyd*, 166 Ill. 2d at 196 n.2.

In this case, plaintiff fails to demonstrate that but for the alleged missing and altered cardiac monitoring strips, it had a reasonable probability of succeeding in its case against Dr. Bekas in the underlying medical malpractice action.

The threshold issue in a medical malpractice action is the standard of care against which a doctor's negligence is judged. *Mansmith v. Hameeduddin*, 369 Ill. App. 3d 417, 426, 860 N.E.2d 395 (2006). In a medical malpractice case, the plaintiff must offer expert testimony to establish the applicable standard of care, the breach thereof by a defendant physician or hospital, and that this breach resulted in injury. *Evanston Hospital v. Crane*, 254 Ill. App. 3d 435, 441, 627 N.E.2d 29 (1993).

The case against Dr. Bekas was premised solely on the allegation that he deviated from the standard of care during the decedent's stay in the intensive care unit by failing to adequately communicate the decedent's postoperative condition to incoming physician Dr. Hall. Plaintiff's expert witness, Dr. Schapira, opined that during the time

Dr. Bekas cared for the decedent in the intensive care unit, he deviated from the standard of care in the following respects: failed to appreciate the importance and significance of the PVCs the decedent was experiencing; and failed to report other conditions shown on the decedent's postoperative lab report such as falling bicarbonate, ion, and magnesium levels, which indicated that the decedent's heart was under stress.

Dr. Schapira testified that prior to rendering his opinions he reviewed the depositions of the various doctors and nurses who cared for the decedent, the decedent's medical records which included chest X-rays, results of echocardiograms, EKGs, thallium stress tests, and an autopsy report. Thus, the record shows that even without the alleged missing and altered cardiac monitoring strips, Dr. Schapira had sufficient information to render his standard of care opinion against Dr. Bekas.

In fact, a review of the record shows that Dr. Schapira specifically testified that he possessed sufficient information to form his opinions concerning the patient:

"Q. [Catholic Health Partners' attorney]: As you sit here today, do you have enough information to form opinions on this patient that are more than just speculation?

A. [Dr. Schapira]: Yes.

Q. [Catholic Health Partners' attorney]: So you from the records and everything you've been provided are able to fully support your opinions that you've given today?

A. [Dr. Schapira]: Yes, sir, I am."

In sum, we find that no genuine issues of material fact were raised as to whether the alleged loss and alteration of the cardiac monitoring strips caused plaintiff to be unable to prove its case against Dr. Bekas in the underlying medical malpractice action. Therefore we hold that the trial court did not err in granting summary judgment in favor of Catholic Health Partners on this issue.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WOLFSON and GARCIA, JJ., concur.