2020 IL App (1st) 190636-U

No. 1-19-0636

Second Division
December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MARTHA AVILA, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| v. | ) | No. 16 L 3548 |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| Defendant-Appellee, | ) | Honorable Thomas M. Donnelly and Richard P. Callahan, Jr. Judges, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the circuit court is affirmed in part and reversed in part. The trial judge did not err in striking portions of plaintiff's complaint, in denying plaintiff leave to amend her complaint, in ruling on evidentiary matters, or in instructing the jury. However, we vacate the judgment only to the extent the court erroneously awarded defendant the cost of an unnecessary jury demand fee.

¶ 2    On the morning of December 24, 2009, plaintiff, Martha Avila, sustained significant injuries after falling down a staircase at the Randolph/Wabash elevated "L" station, which is

owned by defendant, the Chicago Transit Authority (CTA). Following a trial in 2018, the jury returned a verdict in favor of the CTA and against plaintiff. Plaintiff now appeals, asserting numerous errors by the trial court. For the following reasons, we vacate part of the costs awarded to the CTA but affirm the judgment in all other respects.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Complaints

¶ 5     Plaintiff filed her original suit in this controversy on June 1, 2010, alleging that the CTA was liable for her injuries because the staircase on which she fell (1) lacked an anti-skid surface where the landing met the top step and (2) had handrails that extended only to the top step rather than continuing over the landing. Plaintiff voluntarily dismissed the case without prejudice in August 2015. She then re-filed suit on April 7, 2016, with a complaint substantively identical to the one from 2010.

¶ 6     On May 4, 2018, plaintiff was granted leave to file an amended complaint. The amended complaint stylized plaintiff's allegations as: one count of premises liability based on the highest degree of care (count I), one count of premises liability based on an ordinary level of care (count II), one count of negligence based on the highest degree of care (count III), and one count of negligence based on an ordinary level of care (count IV). For all counts, plaintiff asserted that the CTA was liable for her fall and injuries because it, among other things, "[c]hose to allow the [landing] to remain without an anti-skid surface," and "[c]hose not to have the handrails extend to the [landing] *** within easy reach of anyone walking down the staircase." The amended complaint also alleged that the CTA "[c]hose not to provide the [landing] with an anti-skid surface, although it had undertaken to provide anti-skid surfaces to all other [landings] of the staircases at the Randolph and Wabash station."

- 2 -

¶ 7                              B. The CTA's Motion to Strike

¶ 8      The CTA filed a motion to dismiss counts I and III of the amended complaint pursuant to section 2-615 of the Code of the Civil Procedure (Code) (735 ILCS 5/2-615 (West 2016)), arguing that it did not owe plaintiff the highest degree of care because "Illinois courts have long held that the duty of a carrier to provide reasonably safe depots, platforms and approaches for the use of passengers who are at the exiting and at the end of their journey requires the exercise of only ordinary care." The CTA also moved to strike paragraph 16 from the amended complaint, which alleged that CTA employee Dwayne Morgan witnessed another passenger fall from the top of the same staircase approximately one hour before plaintiff. Lastly, the CTA moved to strike numerous other paragraphs from the amended complaint pertaining to the condition of other staircases at the Randolph/Wabash station. The CTA contended that these paragraphs—which alleged that the landings of two other staircases were equipped with anti-skid plates—were not relevant to the issue of whether the staircase on which plaintiff fell was reasonably safe.

¶ 9      After a hearing, the court issued an order dismissing counts I and III, stating that this was "not a highest duty of care case" because plaintiff had already exited the train and "reached a point of safety." The court also granted the CTA's motion to strike the paragraphs concerning the prior fall and the other staircases at the station.

¶ 10                             C. Motions *in Limine*

¶ 11     On September 4, 2018, the trial court ruled on the parties' various motions *in limine*. Over the CTA's objection, the court granted plaintiff's motion to bar evidence that there were no other slip-and-fall claims involving the relevant staircase in the year preceding plaintiff's fall. In so ruling, the court explained that it was "going to try and keep this trial focused on the date, time, and occurrence in question." Applying the same logic, the court also barred evidence concerning

the condition of the other staircases at the Randolph/Wabash station, stating that whether the CTA "did it right other times" was irrelevant to whether the particular staircase in question was in a reasonably safe condition at the time of plaintiff's fall.

¶ 12 The CTA also moved to bar evidence that Morgan witnessed the unknown male passenger fall on the same staircase approximately one hour before plaintiff. The court granted the motion, opining that "[n]othing in the proffer made by the Plaintiff relates to anything other than the slippery condition," which the CTA removed from evidence by admitting that the staircase was slippery with ice and snow on the morning in question.

¶ 13 The CTA further moved to exclude testimony from Robert Fahlstrom, a manager for the Chicago Department of Buildings who would have testified that the CTA was required to comply with the Chicago Building Code (building code) when repairing its facilities. Before ruling on the motion, the court asked plaintiff's counsel whether "this generalized testimony will be necessary" in light of the CTA's concession that the building code was applicable. Plaintiff's counsel agreed that Fahlstrom's testimony was no longer necessary, and the court granted the CTA's motion to exclude it.

¶ 14 Finally, the trial court barred, as an inadmissible subsequent remedial measure, evidence that CTA employees temporarily closed the staircase after plaintiff's fall.

¶ 15                          D. Request for Leave to Amend

¶ 16 On September 5, 2018, plaintiff filed a motion requesting leave to file a second amended complaint. The proposed second amended complaint re-pled the allegations and counts previously stricken by the court, and added new allegations that the CTA was negligent in (1) inadequately removing ice from the staircase and (2) failing to close the staircase prior to her fall. The proposed amendment would have also alleged that, while other staircases at the station featured "round,

tubular-style handrails," the staircase on which plaintiff fell merely had "railings" that "did not extend to the [landing] and were not within easy reach of a person standing on that [landing]."

¶ 17    The trial court denied leave, opining that "the case law is clear against allowing the amendment," particularly in light of the prejudice that the CTA would suffer if plaintiff were allowed to add facts on the eve of trial that were not pled in any previous complaint.

¶ 18                                          E. Trial

¶ 19    The following relevant facts were adduced at trial.

¶ 20    Plaintiff testified that on the morning of December 24, 2009, she got off the train at the Randolph/Washington station on her way to work. At the time, she was approximately 5'1", 220 pounds, and six months pregnant. As plaintiff exited the train just before 7 a.m., she observed "patches of ice and water everywhere." She took "baby steps" down a first set of stairs leading to an intermediate level and then walked across the mezzanine towards the staircase to street level located in the northeast corner of the station. Plaintiff testified that she always used this staircase on the way to work so that she would not have to cross the street at street level.

¶ 21    Upon arriving at the top of the northeast staircase, plaintiff saw a CTA employee chopping ice with a shovel on the stairs below. She asked the employee for help, but he "completely ignored" her. Plaintiff testified that there was no anti-skid surface at the top of the landing and no round handrails. She tried to grab the flat railing that extended to the top step, but it was too wide to put her hand around. She "went with [her] right leg and [she] slipped" onto her back before her right foot made contact with the top step. She fell down approximately 15 steps to the middle of the staircase.

¶ 22    Dwayne Morgan testified that he was on duty as a CTA customer assistant on the morning of December 24, 2009. When he arrived at the station around 5:45 a.m., it was approximately 20

degrees and there was an "ice storm." He ascended the northeast staircase, which was "completely covered in ice." At approximately 6 a.m., Morgan notified control and maintenance about the weather conditions. He then used a pointed shovel to break up some of the ice on top of the landing, but he was unable to clear all of it. Morgan also used the shovel to break up ice on the bottom two stairs and was working on the third when he stopped to allow some newly-arrived passengers to come down.

¶ 23    Morgan testified that he saw plaintiff at the top landing, but she did not ask for his help. Plaintiff grabbed the railing to her right with both hands and put one of her feet on the top step. Then, "her leg gave way and she slid down about seven steps." Plaintiff did not let go of the railing until after she stopped falling. Morgan radioed the incident to control, and an ambulance arrived to take plaintiff to the hospital.

¶ 24    Gerald Brin, plaintiff's architectural expert, testified that the CTA was required to comply with the Chicago Building Code when repairing or replacing an existing staircase. Brin opined that the staircase on which plaintiff fell did not comply with the building code in at least two respects: (1) the top of the landing did not have an anti-skid surface and (2) "there were no handrails." Brin stated that a Wooster plate, which is a metal plate with "little grits" on it, is an appropriate anti-skid surface. Although the steps of the staircase in question were equipped with Wooster plates, there was no such plate on the landing above the top step. However, Brin agreed that the building code did not necessarily require a Wooster plate, but only some form of "slip resistant surface." He also stated that the use of creosote, while is primarily meant to increase the longevity of wooden surfaces, "can provide traction or anti-skid" and may comply with the building code under some circumstances. Brin did not know whether there was creosote present on the landing at the time of plaintiff's fall.

¶ 25    Regarding handrails, Brin testified that the building code required a staircase the size of the one in question to have a handrail on each side. According to Brin, the railings on either side of the northeast staircase did not qualify as "handrails" because they were 2.5 inches wide and therefore too wide for "people with smaller hands" to grip easily. Brin further testified that the building code required that every handrail mounted to a wall must terminate by turning itself back into the wall so that a person can grip it before engaging the stairs. The railings on the staircase in question did not turn back toward the wall and extended only to the top step, meaning that they were approximately three inches short of creating a continuous handrail.

¶ 26    Daniel Schiffer, a "senior manager of structural maintenance" for the CTA, testified that the northeast staircase was "replaced in kind" in 2008, meaning that the components were replaced exactly as they were without bringing them into compliance with the current version of the building code. According to Schiffer, the CTA was only required to bring structures up to code when performing entirely new construction, not when replacing existing structures in kind. In any event, the landing was not part of the 2008 replacement. Schiffer opined that the railings on the staircase were "reasonably safe" and that he was able to easily put his hand around them.

¶ 27    Leonard Biancofiori testified that he was a "senior coordinator for labor ground management" at the CTA, which included supervising the CTA's carpenters. Biancofiori stated that the landing of the northeast staircase was made of creosote-treated wood, which provided both increased longevity and an anti-skid surface. To his knowledge, there was never a Wooster plate on the landing. He opined that, although the creosote on the landing showed some wear and tear, there was sufficient creosote at the time of plaintiff's fall to provide "stickiness." Biancofiori was not familiar with the provisions of the building code related to handrails on staircases.

¶ 28    David Wright, a former "senior manager of safety" for the CTA testified that his duties included ensuring that every staircase underwent a quarterly safety inspection. Although he was not personally familiar with the requirements of the building code, he inspected the northeast staircase in August 2009 and concluded that it was safe. Wright explained that the landing never had an anti-skid plate but instead used creosote-treated wood to provide a slip-resistant surface. He stepped on the creosote as part of his August 2009 inspection and determined that the creosote coverage was "adequate." Wright also stated that he was able to put his hand around the handrails and had no problem gripping them from the landing.

¶ 29    As part of its case-in-chief, the CTA published to the jury a certified report from the National Centers for Environmental Information showing that the weather at O'Hare International Airport was 32 degrees with freezing rain at 3 a.m. on December 24, 2009.

¶ 30                                    F. Jury Instructions

¶ 31    Plaintiff tendered jury instructions on both ordinary negligence and premises liability. At the instruction conference, the CTA objected to the negligence instruction, arguing that this was a premises liability case because it involved the "static condition of the property" rather than "active negligence." Plaintiff's counsel responded that both instructions should be given and that "our theory is negligence" because the CTA "created the [unsafe] condition when they did not put in a handrail and they did not put in a Wooster tread." Upon further questioning by the trial court, plaintiff's counsel clarified that plaintiff's position was that the staircase was "unreasonably safe at the time she was on the property." Additionally, plaintiff's counsel conceded that "the duty remains the same regardless of whether it's a negligence or a premises liability theory." Ultimately, the court refused plaintiff's negligence instruction and instructed the jury, in accordance with Illinois Pattern Jury Instructions, Civil, No. 120.02, that, "It was the duty of the Chicago Transit

Authority as the owner of the CTA station landing and stairwell in question to exercise ordinary care to see [that] the property was reasonably safe for use by those lawfully on the property."

¶ 32     The trial court also instructed the jury, in accordance with IPI, Civil, No.125.01, "However, [the] Chicago Transit Authority as owner of the CTA station and landing and stairwell is under no duty to remove ice or water which has resulted from natural accumulation."

¶ 33     The court further instructed the jury on two relevant provisions of the building code in effect at the time of plaintiff's fall: (1) that all staircases "shall have handrails on both sides" and (2) that "the finished surface of treads and landings on stairs shall be of materials which will not cause danger of slipping." See Chicago Municipal Code §§ 13-160-320, 13-160-330. The court informed the jury as to each provision that "[i]f you decide that a party violated this ordinance on the occasion in question, you may consider that fact together with all the other facts in evidence *** in determining whether and to what extent, if any, a party was negligent before or at the time of the occurrence."

¶ 34     Finally, the court refused plaintiff's instruction on the "deliberate encounter" exception to the "open and obvious" rule, reasoning that the only possible open and obvious danger was the natural accumulation of ice and water, which was not a basis for recovery in the first place.

¶ 35                              G. Verdict and Posttrial Motions

¶ 36     On September 18, 2018, the jury returned a verdict in favor of the CTA and against plaintiff. In response to special interrogatories, the jury also found, among other things, that plaintiff's contributory negligence exceeded 50% of the total proximate cause for her injuries and that there was no condition on the property, other than ice and water, which presented an unreasonable risk of harm.

¶ 37    On March 1, 2019, the trial court denied plaintiff's posttrial motion. The court also awarded the CTA a total of $360.50 in costs pursuant to section 5-109 of the Code (735 ILCS 5/5-109 (West 2018)). This appeal followed.

¶ 38                                   II. ANALYSIS

¶ 39    On appeal, plaintiff raises numerous claims of error, which we will address in turn.

¶ 40                          A. The CTA's Section 2-615 Motion

¶ 41    First, plaintiff contends that the trial court erred in granting the CTA's section 2-615 motion to strike allegations from her amended complaint. Specifically, plaintiff claims that the court erred in striking paragraphs regarding (1) a prior fall on the same staircase approximately one hour before plaintiff and (2) the condition of other staircases at the Randolph/Wabash station. Plaintiff also claims that the court erred in dismissing the counts from her complaint which alleged that the CTA owed her the highest duty of care.

¶ 42                                   1. The Prior Fall

¶ 43    Initially, we note that plaintiff argues that the court improperly granted the strike prior fall from her complaint while relying in part on the CTA's admission that the staircase in question was "slippery." According to plaintiff, this was error because a section 2-615 motion does not allow a court to look beyond the four corners of the complaint. However, when considering a section 2-615 motion, a court may look not only to the face of the complaint, but also to judicial admissions in the record and matters of which the court may take judicial notice. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 18; *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25. Unless it is a product of mistake or inadvertence, an admission in a verified answer constitutes a binding judicial admission. *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 19.

¶ 44 Moreover, evidence of prior accidents is only admissible if relevant. *Redlin v. Village of Hanover Park*, 278 Ill. App. 3d 183, 192-93 (1993). Where, as here, a plaintiff seeks to admit evidence of a prior accident to show notice of a dangerous condition, the prior accidents must be "substantially similar" to the accident in question. *Enbridge Energy, Limited Partnership v. Village of Romeoville*, 2020 IL App (3d) 180060, ¶ 55. Although the circumstances need not be identical, "the condition or thing shown to be the common cause of danger in such earlier accidents must be the condition or thing contributing to the danger of the accident complained of." *Trimble v. Olympic Tavern, Inc.*, 239 Ill. App. 3d 393, 397 (1993). Determining whether the prior and current accidents are sufficiently similar is within the sound discretion of the trial court, and the court's decision will not be disturbed an abuse of that discretion. *Enbridge*, 2020 IL App (3d) 180060, ¶ 55. "An abuse of discretion occurs only where no reasonable person would take the position adopted by the trial court." *Id.*

¶ 45 Here, plaintiff did not allege, and cannot show, a common cause between her fall and the previous fall. Plaintiff's amended complaint alleged merely that "CTA employee Dwayne Morgan witnessed a passenger slip and fall from the top of the stairs at the northeast corner of Randolph and Wabash." According to plaintiff's offer or proof, the man "just walk[ed] off" without seeking medical attention before Morgan could take his name or any other information. Morgan did not state at trial or in his deposition that the man attempted to grab the railings. Without such evidence, there was little basis to conclude that the prior fall was due to the absence of Wooster plate or continuous handrail. Under these circumstances, we cannot say that the trial court abused its discretion in finding that plaintiff failed to plead a common cause between her fall and the prior fall.

¶ 46 2. Condition of Other Staircases

¶ 47    We now turn to the paragraphs involving the other staircases at the Randolph/Wabash station. Plaintiff claims that these allegations were relevant to establish that the CTA had voluntarily undertaken to equip the landings of all staircases at the station with Wooster plates.

¶ 48    Under a voluntary undertaking theory of liability, a party who undertakes to perform an action or render a service to another is liable for injuries caused by that party's failure to exercise due care in the performance of the undertaking. *Rhodes v. Illinois Cent. Gulf R.R.*, 172 Ill. 2d 213, 239 (1996). However, this theory is to be construed narrowly, and the duty of care imposed upon a party is strictly limited to extent of the undertaking. *Elam v. O'Connor & Nakos, Ltd.*, 2019 IL App (1st) 181123, ¶ 41. Whether a defendant has voluntarily undertaken a duty to a plaintiff is a question of law for the trial court to decide. *Jakubowski v. Alden-Bennett Const. Co.*, 327 Ill. App. 3d 627, 639 (2002). We review questions of law *de novo*. *Village of Franklin Park v. Sardo*, 2020 IL App (1st) 191161, ¶ 23.

¶ 49    "The voluntary undertaking doctrine applies to both misfeasance—performing the undertaking negligently—and to nonfeasance—failure to perform the undertaking." *Lewis v. Chica Trucking, Inc.*, 409 Ill. App. 3d 240, 254 (2011). However, courts have historically drawn a distinction between the two. *Bell v. Hutsell*, 2011 IL 110724, ¶ 23. Although plaintiff seems to suggest this is a case of misfeasance, *i.e.* that the CTA fell short of its goal to equip all staircase landings with Wooster plates, if anything, this is clearly a case of nonfeasance *vis-à-vis* the northeast staircase. Stated another way, as plaintiff concedes, the CTA took no action to install a Wooster plate on the northeast staircase. Our supreme court has explained that "a plaintiff's reliance on the defendant's promise [to perform the undertaking] is an independent, essential element in cases of nonfeasance." (Internal quotation marks omitted.) *Id.*; see also *Claimsone v. Professional Property Management, LLC*, 2011 IL App (2d) 101115, ¶ 22 (stating that reliance is

an element in cases of nonfeasance). Here, there is no indication that the CTA ever expressed an intention to install a Wooster plate on the northeast staircase, nor did plaintiff allege that she relied on any such promise. Thus, the court did not err in striking plaintiff's voluntary undertaking theory.

¶ 50                                  3. Highest Degree of Care

¶ 51    Plaintiff next argues that the circuit court erred in dismissing counts I and III from her amended complaint, which alleged that the CTA owed her the highest degree of care.

¶ 52    A common carrier has a duty to its passengers to exercise the highest degree of care, which extends not only to safely carrying passengers to their destinations, but also to providing them "a reasonable opportunity to board and leave the conveyance safely." *Anderson v. Chicago Transit Authority*, 2019 IL App (1st) 181564, ¶ 26. "However, it is well established that once a passenger has safely alighted from a train the only duty a carrier owes a passenger that debarked from the train is the duty of ordinary care*." Jones v. Chicago and Northwestern Transportation Co.*, 206 Ill. App. 3d 136, 138 (1990). The exact point at which the duty of highest care terminates is not clearly defined in law and depends on the facts and circumstances of each case. *Id.* Whether a passenger-carrier relationship existed at the time of the plaintiff's injuries is a question of law for the court to determine. *Eskew v. Burlington Northern and Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶ 56.

¶ 53    Here, plaintiff contends that the CTA's duty of highest care was still in effect because she had not yet reached a place of safety. She also argues that she was "within the CTA's control at all times" because there was no way to reach the street level without descending one of the staircases provided by the CTA. However, "[i]t has consistently been held that the duty of a carrier to provide reasonably safe depots, platforms, and approaches for the use of passengers requires the exercise of only ordinary care." *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554, 573 (1991).

¶ 54    The cases upon which plaintiff relies are distinguishable, as they all involve passengers who were injured while either waiting for a train or in the process of boarding one. See *Katamay v. Chicago Transit Authority*, 53 Ill. 2d 27, 28 (1972) (plaintiff tripped while attempting to board a train); *Eskew*, 2011 IL App (1st) 093450, ¶ 34 (plaintiff "was standing on the platform in a place where passengers routinely boarded and alighted from commuter trains"); *Skelton*, 214 Ill. App. 3d at 573 (plaintiff struck by an incoming train while waiting at the platform).

¶ 55    We find this case to be more like *Davis v. South Side Elevated R.R. Co.*, 292 Ill. 378, 379 (1920), where the plaintiff had exited the train, walked through the station, and "reached the landing on the stairs going to the street when she slipped on a banana skin and fell." Our supreme court held that the jury should have been instructed on only ordinary care, explaining that "the danger incurred [in stations and approaches] is not the same as it is on moving trains." *Id.* at 384. Here, as in *Davis*, plaintiff had safely exited the train, walked through the station, and only then fell on the stairs leading down to the street. Under these circumstances, the trial court did not err in ruling that the CTA owed plaintiff only an ordinary degree of care.

¶ 56                              B. Denial of Leave to Amend

¶ 57    Next, plaintiff argues that the trial court erred by denying her leave to file a second amended complaint. Although leave to amend should generally be granted freely, a party's right to amend a pleading is not absolute. *In re Marriage of Lyman*, 2015 IL App (1st) 132832, ¶ 51. In considering whether to allow amendment, a court considers the following four factors: (1) whether the proposed amendment would cure any defects in the pleading, (2) whether the opposing party would be prejudiced or unfairly surprised by the amendment, (3) whether the amendment is timely, and (4) whether the plaintiff had previous opportunities to amend the complaint. *City of Chicago v. City of Kankakee*, 2019 IL 122878, ¶ 20. A trial court's decision on whether to grant leave to

amend will not be disturbed on appeal unless the court abused its discretion. *U.S. Bank National Association v. Miller*, 2020 IL App (1st) 191029, ¶ 33. A court abuses its discretion in denying leave to amend where no reasonable person would take the view adopted by the court. *Id.*

¶ 58    Here, aside from re-pleading allegations and counts that were previously stricken, plaintiff's proposed second amended complaint essentially sought to add new theories that the CTA was negligent in (1) failing to remove ice from the landing and (2) failing to close the staircase prior to plaintiff's fall.

¶ 59    We cannot say that the trial court abused its discretion in denying leave to amend, as the relevant factors weigh against allowing amendment. First, plaintiff's proposed amendment did not cure any specific defect identified by the court, so that factor is at best neutral. Second, although plaintiff argues that the new factual allegations would not have resulted in prejudice because the CTA was already aware of them, " '[p]rejudice may be shown where delay before seeking an amendment leaves a party unprepared to respond to a new theory at trial.' " *Lacey v. Perrin*, 2015 IL App (2d) 14114, ¶ 78 (quoting *Miller v. Pinnacle Door Co.*, 301 Ill. App. 3d 257, 261 (1998)). Third, plaintiff was also apparently aware of the allegations added to her proposed second amended complaint as early as 2011. Yet, she waited until September 5, 2018—the day before trial was set to begin—to request leave to amend. " 'Amendments during or on the eve of trial should not ordinarily be permitted if such amendments concern matters which the pleader knew at the time the original pleading was filed and for which the pleader offers no good reason for not having pleaded the matter in the original pleading.' " *Flynn v. Maschmeyer*, 2020 IL App (1st)190784, ¶ 127 (quoting *First National Bank & Trust Co. of Evanston v. Sousanes*, 66 Ill. App. 3d 394, 396 (1978)). We therefore cannot say that the trial court abused its discretion in denying plaintiff leave to amend.

¶ 60                          C. Evidentiary Rulings

¶ 61     Plaintiff next contends that the trial court made several erroneous evidentiary rulings that effectively prevented her from presenting what she considers "crucial evidence" to the jury.

¶ 62     Evidentiary rulings, such as rulings on motions *in limine*, are generally left to the discretion of the trial court and will not be reversed on appeal unless the court abused that discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). "A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable man would take the view adopted by the court." *Id.* Additionally, even where the court could be said to have abused its discretion, reversal is appropriate only if the record also indicates that the error resulted in substantial prejudice that affected the outcome of the trial. *Id.*

¶ 63                          1. The Prior Fall

¶ 64     First, defendant contends that the court erred in preventing Morgan from testifying to the fall that occurred about an hour before plaintiff's. However, as previously explained, evidence of a prior accident is admissible to prove a particular danger only where the proponent shows that the prior accident shares a common cause with the accident *sub judice*. See *Trimble,* 239 Ill. App. 3d at 397. Here, defendant proffered virtually no detail about the cause of the prior fall, and the court was therefore within its discretion to exclude it.

¶ 65                          2. Applicability of the Building Code

¶ 66     Second, plaintiff assigns error to the trial court's decision to exclude Fahlstrom's testimony that the building code applies to CTA structures such as the northeast staircase. According to plaintiff, Fahlstrom's testimony was important because it would have contradicted the testimony of Biancofiori and Schiffer, who suggested that the CTA need not comply with the building code when repairing existing structures.

¶ 67    However, the record shows that the court granted the CTA's motion to exclude Fahlstrom's testimony only after plaintiff's counsel agreed such testimony would no longer be necessary in light of the CTA's concession that the building code applied. It is fundamental that "[a] party cannot complain of error which he induced the court to make or to which he consented." *McMath v. Katholi*, 19 Ill. 2d 251, 255 (2000). Nor may a party raise an error on appeal where doing so would be inconsistent with the position taken by that party in an earlier court proceeding. *Id.* Additionally, even assuming, *arguendo*, that the trial court should have allowed Fahlstrom's testimony, any error would have been harmless where the court instructed the jury that the building code applied to CTA and that any code violations could be considered as evidence of negligence.

¶ 68                              3. Closure of the Staircase

¶ 69    Third, plaintiff argues the trial court erred in excluding testimony from CTA janitor Kathleen Jungman that CTA employees closed the northeast staircase shortly after plaintiff's fall. Plaintiff contends that such testimony is "important here because it establishes that the CTA, which argued throughout that it had no control over the weather, *did* have control over whether its passengers would have to suffer the dangerous effects of Mother Nature." (Emphasis in original.).

¶ 70    Evidence of postaccident remedial measures, like the closure of a staircase, is generally inadmissible to prove negligence. *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 76. Such evidence may be admissible for other purposes, such as to prove ownership or control of property or the feasibility of precautionary measures. *Garcia v. Goetz*, 2018 IL App (1st) 172204, ¶ 46. However, this is so only where control or feasibility is disputed by the defendant. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300-01 (1995); *Garcia*, 2018 IL App (1st) 172204, ¶ 46.

¶ 71    Here, although the CTA noted that it could not control the weather, it never claimed that it did not control the staircase in question or that it would have been infeasible to close it. Thus, there

was no basis upon which to admit Jungman's testimony, and the trial court did not abuse its discretion in excluding it.

¶ 72                              4. Denial of Leave to Reopen Proofs

¶ 73    Fourth, defendant asserts that the trial court erred by refusing to allow her to reopen her case at the close of evidence in order to read in the discovery deposition of John Fasula, the deceased former manager of systems maintenance for the CTA. At his deposition, Fasula testified that he supervised CTA carpenters who would sometimes install Wooster plates on staircases pursuant to work orders. According to Fasula, the sole function of Wooster plates—which he called "stair savers"—was to "save the wear on the step[s]." Wooster plates were generally not installed on landings but may have been installed as "gap fillers" to close a gap between a landing and a top step. However, Fasula could tell that the landing of the northeast staircase never had a Wooster plate because no holes had been drilled for one. Although he agreed that slip-resistance was an important safety feature for a staircase landing, he believed that the creosote-treated wood "already has a slip resistance in it." Fasula further stated that his carpenters would also install either a round or rectangular handrail on a staircase depending on "whatever they have basically." He could not say whether one type of handrail was safer than the other.

¶ 74    Whether to grant or deny a motion to reopen proofs is within the sound discretion of the trial court. *In re Marriage of Davis*, 215 Ill. App. 3d 763, 776 (1991). In considering a motion to reopen proofs, the court should weigh factors such as (1) the existence of an excuse for not introducing the evidence at trial, (2) whether the opposing party would be unfairly surprised or prejudiced by the new evidence, and (3) whether the evidence is of the utmost importance to the movant's case. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 55.

¶ 75    Here, plaintiff claims that she did not introduce Fasula's testimony because there was an agreement between the parties that the CTA would read Fasula's deposition into evidence during its case-in-chief. The CTA, on the other hand, acknowledges that it expressed an intention to use Fasula's deposition at trial, but denies that it was bound to do so. Instead, the CTA maintains that it was free to modify its defense strategy and that plaintiff took a "calculated risk" that the CTA would call Fasula.

¶ 76    We agree with the CTA. Although the record shows that the CTA stated its intention to read Fasula's deposition (and even asked plaintiff which portions of the deposition she would like read), plaintiff has pointed to no binding agreement that the deposition would be introduced into evidence. Rather, the agreement was that "[t]he parties may use the discovery deposition of John Fasula at trial pursuant to Rule 212 (a)(5)." Thus, plaintiff was free to read the deposition as part of her case-in-chief but chose not to do so.

¶ 77    Reasons for not calling Fasula aside, plaintiff has not shown how Fasula's deposition was "of the utmost importance" to her case. Indeed, Fasula deposition was largely harmful to plaintiff's theory of the case, as he (1) denied that Wooster plates should be installed on landings for slip-resistance, (2) stated that creosote-treated wood provided the landing with a slip-resistance surface, and (3) would not say that the rectangular railings like the one on the northeast staircase were less safe than other types. Accordingly, it was within the trial court's discretion to deny plaintiff an opportunity to reopen proofs.

¶ 78                              D. Jury Instructions

¶ 79    Plaintiff next raises claims of error relating to the trial court's jury instructions. Generally, parties have a right to have the jury instructed on their respective theories of the case if those theories are supported by the evidence and reasonable inferences drawn therefrom. *Bailey v. Mercy*

*Hospital and Medical Center*, 2020 IL App (1st) 182702, ¶ 84. The trial court has discretion in deciding which instruction to give, and the court's decisions will not be disturbed on appeal unless they are an abuse of that discretion. *Id.* In determining whether the trial court abused its discretion, a reviewing court must consider the instructions in their entirety and evaluate whether they fairly and fully informed the jury of the relevant law. *Id.* However, where the issue is whether an instruction accurately stated the law, we give no deference to the trial court and instead review the instruction *de novo*. *Id.* Errant jury instructions typically do not warrant a new trial unless they clearly mislead the jury and resulted in substantial prejudice to the appellant. *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314, ¶ 37.

¶ 80                                     1. The Natural Accumulation Rule

¶ 81      Plaintiff first contends that the trial court erred in instructing the jury that the CTA was under no duty to remove any ice or water on the staircase that resulted from natural accumulation.

¶ 82      It is well-established that the CTA is not obligated to remove natural ice, water, and snow. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 232-33 (2010). Even so, according to plaintiff, a natural accumulation instruction was inappropriate in this case because the sole issue for the jury to decide was whether the lack of Wooster plate and handrail caused her fall and injuries. However, plaintiff's position ignores that the CTA's competing theory was that it was the natural accumulation of ice and water that caused her to fall. As there was ample evidence of ice on the staircase, the CTA was entitled to a natural accumulation instruction. See *Swartz v. Sears, Roebuck and Co.*, 264 Ill. App. 3d 254, 269 (trial court erred in refusing a natural accumulation instruction where there was "some" evidence of rainwater in the area where the plaintiff slipped).

¶ 83      Plaintiff's contention that "natural accumulation is not a defense" in cases alleging defective structures is unavailing, and the two cases she cites for this proposition are inapposite.

First, in *Kalata v. Anheuser-Busch Companies, Inc.*, 144 Ill. 2d 425 (1991), the issue on appeal to our supreme court was whether the appellate court properly reversed a judgement for the plaintiff where the appellate court determined that there was insufficient evidence to conclude that the absence of a right handrail was the proximate cause of the plaintiff's fall on a staircase. Our supreme court reversed the appellate court, holding that the trial court's judgment was supported by sufficient evidence. *Id.* at 438. For example, the plaintiff testified that he slipped while crossing to the left side of the staircase in order to grab the handrail there because there was none on the right side. *Id.* Without deciding whether the snow and ice on the staircase was the result of natural or unnatural accumulation, our supreme court also noted that its presence did not necessarily "break the causal connection between the violation of the ordinance [*i.e.*, the lack of handrail] and [the] plaintiff's injuries." *Id.* at 439.

¶ 84    Here, in contrast, the issue is not the sufficiency of the evidence supporting a factfinder's determination regarding proximate cause, but whether the jury should have been instructed that natural accumulation could be a defense. The jury in the case *sub judice* certainly could have found that the construction of the staircase caused plaintiff's injuries notwithstanding the icy conditions. However, the jury did not so decide, and *Kalata* is therefore irrelevant.

¶ 85    Although plaintiff's other case, *McCarthy v. Kunicki*, 355 Ill. App. 3d 957 (2005), does involve jury instructions, it too is inapposite. There, the appellate court held that the trial court erred by refusing to instruct the jury on applicable building code provisions where there was evidence that the plaintiff's fall was caused by the absence of a handrail. *Id.* at 970-71. Thus, unlike in the present case, the issue was not whether the trial court gave an erroneous instruction but whether the court's instructions fully informed the jury of the plaintiff's theory of the case.

Moreover, *McCarthy* has nothing to do with the natural accumulation rule. Accordingly, that case does not require reversal here.

¶ 86                                    2. Negligence

¶ 87    Plaintiff's next claim of error in the jury instructions is the trial court's decision to instruct the jury on premises liability rather than ordinary negligence. This case is similar to *Garcia v. Goetz*, 2018 IL App (1st) 172204, ¶ 33, where this court affirmed the trial court's decision to refuse a negligence instruction and instead instruct the jury solely on premises liability. In so ruling, we explained that most of the plaintiff's claims, *e.g.* that the staircase on which he fell violated the building code, involved the condition of the staircase and therefore sounded in premisses liability rather than negligence *Id.* Here, like in *Garcia*, plaintiff's theory was that her injuries were caused by the condition of the staircase in that it lacked handrails and an anti-skid plate on the landing. Thus, we cannot say that the trial court abused its discretion by instructing on premises liability rather than ordinary negligence.

¶ 88    We also note that, even if the court had abused its discretion, reversal would remain unwarranted because plaintiff cannot show prejudice. On appeal, plaintiff claims she was prejudiced by the premises liability instruction because it required her to prove an extra element, namely that the CTA had notice of the condition of the staircase. A review of the record, however, reveals that the CTA's notice was not an issue and could not have formed the basis for the jury's verdict. Indeed, the jury's answers to the special interrogatives shows that it found for the CTA not because it believed the CTA lacked notice but because it concluded that the construction of the staircase did not present an unreasonable risk of harm and that plaintiff was more than 50% responsible for her fall. Thus, there is no doubt that the jury would have reached the same result under either a theory of ordinary negligence or a theory of premises liability.

¶ 89                                    3. Deliberate Encounter

¶ 90     Plaintiff next argues that the trial court erred by refusing to instruct the jury on the "deliberate encounter" exception to the "open and obvious rule." Specifically, plaintiff's proposal would have instructed the jury that, "In order to recover damages, the plaintiff has the burden of proving *** the defendant could reasonably expect that a reasonable person in plaintiff's position, knowing of the condition, would proceed to encounter it because the advantage of doing so outweighs the apparent risk."

¶ 91     The "open and obvious" rule provides that landowners are not required to foresee or protect against an injury if the dangerous condition on their property is open and obvious to a reasonable person. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 16. One exception to this rule applies where the landowner has reason to believe that others would nevertheless deliberately encounter the obvious danger because the advantages of doing so outweigh the apparent risks. *Id.* ¶ 20.

¶ 92     Here, an instruction on the deliberate encounter exception was unwarranted, as the CTA simply did not raise a defense that the staircase was an open and obvious danger. To the extent that plaintiff appears to argue on appeal that the CTA raised the open and obvious nature of ice on the staircase, this position misunderstands the CTA's theory. The CTA contended that it was not liable for injuries caused by ice on the staircase, not because a reasonable person should have avoided obviously icy stairs, but because liability for such injuries is foreclosed by the natural accumulation rule. Compare *Krywin*, 238 Ill. 2d at 232-33 (natural accumulation rule exists because to hold otherwise would place and unreasonable and impractical burden on landowners) with *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 448 (1996) (rationale behind the open and obvious rule is that the law assumes reasonable people should avoid obvious dangers). Because

the open and obvious rule was not invoked in this case, there was no need for the trial court to instruct the jury on exceptions to the rule.

¶ 93                                    E. Jury Demand Fee

¶ 94    Finally, plaintiff argues that the trial court erred by including the amount of the jury demand fee by the CTA in its grant of costs to the CTA.

¶ 95    Section 5-109 of the Code provides that, where a defendant prevails at trial, "judgment shall be entered in favor of defendant to recover defendant's costs against the plaintiff," which "shall be recovered of the plaintiff, by like process as the plaintiff may have had against the defendant, in case judgment had been entered for such plaintiff." 735 ILCS 5/5-109 (West 2018). In *Vicencio v. Lincoln-Way Builders, Inc.*, 204 Ill. 2d 295, 300-01 (2003), our supreme court interpreted the meaning of "costs" for purposes of section 5-108, which governs a successful plaintiff's entitlement to costs. See also *Riley Acquisitions, Inc. v. Drexler*, 408 Ill. App. 3d 397, 408-09 (2011) (applying *Vicencio* to section 5-109). To begin its analysis, our supreme court noted approvingly that in *Galowich v. Beech Aircraft Corp.*, 92 Ill. 2d 157, 165-66 (1982), it defined costs as "expenses necessarily incurred in the assertion of [a party's] rights in court." *Vicencio*, 204 Ill. 2d at 301-302. Recognizing that the *Galowich* definition was overly broad, our supreme court also adopted Black's Law Dictionary's traditional distinction between "court costs" such as filing fees and other "litigation costs" that are necessarily incurred but should not be recoverable, such as attorney's fees. *Id.* at 395 (citing Black's Law Dictionary 350 (7th ed. 1999)). Thus, *Vicencio* teaches that to be recoverable under sections 5-108 and 5-109, an expense must be (1) "necessarily incurred" during the litigation and (2) akin to a filing fee or other courthouse fee. *Id.* at 300-02.

¶ 97    Here, plaintiff does not explicitly argue that a jury demand fee is not a "cost" within the meaning of section 5-109, but contends that the CTA's recovery of the fee in this case is unjust because, as plaintiff had already filed a jury demand and paid the fee, it was unnecessary for the CTA to do so as well. The CTA, on the other hand, contends that it was forced to pay the fee because "[w]ithout exception, Illinois law requires a defendant to demand a jury trial 'not later than the filing of his or her answer,' or risk losing this important constitutional right if a plaintiff withdraws her jury demand." 735 ILCS 5/2-1105(a) (West 2016).

¶ 98    We agree with plaintiff, as it was entirely unnecessary for the CTA to pay a demand fee in this case. Contrary to the CTA's assertion, there was no risk of waiver had plaintiff withdrawn her own demand. Rather, the Code provides that "[i]f the plaintiff files a jury demand and thereafter waives a jury, any defendant *** shall be granted a jury trial upon demand therefor made promptly after being advised of the waiver and upon payment of the proper fees, if any, to the clerk." Thus, the Code contemplates that when, as here, a plaintiff files a jury demand with the complaint, a defendant desirous of a jury will not file his or her own jury demand unless and until the plaintiff subsequently withdraws the demand. In that sense, although the demand fee is in the nature of a filing fee, the CTA's expense in this particular case was not "necessarily incurred." Accordingly, we find that plaintiff should not have been required to reimburse defendant for this unnecessary expenditure under section 5-109. We therefore vacate the order for costs only to the extent it includes the jury demand fee paid by the CTA.

¶ 99                                    III. CONCLUSION

¶ 100   For the reasons stated, we partially vacate the order for costs, but affirm the judgment of the trial court in all other respects.

¶ 101   Affirmed in part; vacated in part.